DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a Gallia County Common Pleas Court summary judgment in favor of Reckart Equipment Company, defendant below and appellee herein. Bert and Mary Aldridge, plaintiffs below and appellants herein, assign the following error for review and determination:
"BY GRANTING SUMMARY JUDGMENT IN FAVOR OF APPELLEE, THE TRIAL COURT COMMITTED REVERSIBLE ERROR BECAUSE THERE EXIST GENUINE ISSUES OF MATERIAL FACT WHETHER APPELLANTS POSSESS VIABLE PRODUCT LIABILITY CLAIMS."
 {¶ 2} Bert Aldridge (Aldridge) suffered injuries while operating a debarking system at work. The debarking system consisted of the debarker, which removed mulch from pieces of wood, and a conveyor system that transferred the mulch from one location to another. HMC Corporation, which is not a party to this litigation, manufactured the debarker. Reckart manufactured the conveyor system to Aldridge's employer's specifications. The conveyor system consisted of two separate conveyors: a horizontal conveyor and a vertical conveyor.
 {¶ 3} Aldridge suffered his injuries as he stood up after clearing accumulated mulch from underneath the intersection of the horizontal and vertical conveyors. As he stood up, his left glove became caught in the conveyor at an unguarded point. Consequently, his left hand and arm were pulled into the debarker.
 {¶ 4} Aldridge and his wife filed a complaint against Aldridge's employer (John Smith d.b.a. SJ Lumber and Melinda Plantz d.b.a. Smith's Forest Products), and Reckart Equipment Company.[1] Their complaint against Reckart contained both statutory and common law product liability claims, including: (1) negligent design and manufacture; (2) negligent failure to warn; (3) strict liability in tort for defective product due to defective design, due to failure to warn, and due to failure to conform to Reckart's representations. Mary Aldridge asserted a loss of consortium claim.
 {¶ 5} On August 13, 2004, Reckart filed a summary judgment motion and raised several arguments in support. First, Reckart argued that intervening and superseding causes excused any negligence on its part and also defeated Aldridge's statutory strict product liability claims. Reckart asserted that Aldridge's conduct in cleaning the system without shutting down the conveyors constituted an intervening and superseding cause. Reckart further contended that Aldridge's employer's negligence, as several OSHA citations demonstrate, constituted an intervening and superseding cause. Reckart noted that OSHA cited the employer for several violations and made the following findings: (1) "[I]n the saw mill, the debarker was not locked out when cleaning operations were performed exposing the operator to a caught between hazard;" (2) "The debarker was not locked out when cleaning the mulch out from under the conveyor"; (3) "[T]he pulley on the take off end of the conveyor under the debarker and pulley on the top take up end of the waste conveyor were not guarded exposing the operator to a caught between hazard"; and (4) "The end pulleys on the conveyor under the debarker and the waste conveyor were not guarded. Employees are exposed to an ingoing nip point when they shovel mulch out from under the conveyor if it is running."
 {¶ 6} Reckart also argued that it had no duty to provide guards for the conveyor system because the lumber industry standard provides that the saw mill owner is responsible for guarding moving shafts on debarkers and similar equipment once the owner completely assembles and configures the equipment at the saw mill. Reckart further argued that Aldridge (1) unforeseeably misused the product by cleaning the conveyor while it was still moving and that his unforeseeable misuse of the product bars his claim; (2) assumed the risk of injury when he chose to clean the system with the conveyors running; and (3) could not prevail on his failure to warn claims because Reckart did not have a duty to warn of the open and obvious danger associated with sticking one's hand into a moving conveyor belt.
 {¶ 7} To support its motion, Reckart relied upon Roger Dean Harris' expert affidavit. Harris explained that the debarking machinery consisted of "an infeed deck, the debarker itself, an outfeed deck, and a mulch conveyor system." Harris focused his investigation on the mulch conveyor system. Harris discovered that the accident occurred at the intersection of the two mulch conveyors. He explained that at the intersection, mulch spilled and accumulated underneath the inclined conveyor and interfered with the conveyor belt tracking. This required periodic removal from under the inclined conveyor. On the date of the injury, when Aldridge noticed that the system required cleaning, he exited the debarker cab and did not shut off the conveyors. While the conveyors were still moving, he cleaned the accumulated mulch by hand from under the inclined conveyor. During the cleaning, a glove on his hand became caught in the in running nip point formed between the conveyor belt and pulley and the ground or mulch accumulation.
 {¶ 8} Harris asserted:
"[A]s is common with much wood products and conveying equipment, the conveyors are not necessarily shipped with all required guards. The final installed configuration and therefore the need for personnel guards is determined by the end user, not the manufacturer. [Reckart's] literature also warns against operation of the conveyors without guards or the use of lock-out devices."
Harris continued:
"Conveyor equipment, particularly for the wood products industry, is typically ordered to width, length, and performance specifications only. The final configuration is a function of the owner/installer, and the equipment is frequently installed on existing owner provided structures, interfacing with existing equipment. Not knowing the final configuration, it is not possible for the conveyor manufacturer to provide all potentially necessary personnel guards. Such equipment is typically shipped with drive guards, as was observed on the conveyors under investigation. Unless charged with providing a complete conveying system or provided with details of the interface of the conveyors with the owner's pre-existing equipment and structures, it is impossible for the conveyor manufacturer to provide all necessary personnel guards."
 {¶ 9} Appellants argued, however, that genuine issues of material fact remained as to all of their claims, thus precluding summary judgment. Appellants asserted that whether an intervening or superseding cause exists, whether the unforeseeable misuse or assumption of the risk defense apply constitutes questions of fact. Appellants submitted Aldridge's affidavit to support their arguments:
"On the first day the debarker was in operation, I was instructed by my boss, Mr. Smith, to keep the area underneath the conveyor belts clean because he did not want his machine mistreated. With the debarker off and the conveyor belts on, Mr. Smith got down on the ground and swept out the accumulated mulch with his hands. I was informed by Mr. Smith that the conveyor belts had to be left on so that the equipment and surrounding areas could be properly cleaned and all the mulch could be transported away. At no time prior to my accident was I aware an injury could occur, nor was I concerned that an injury would, as a result of cleaning the mulch beneath the slowly moving conveyor belts."
 {¶ 10} Aldridge explained that on the date of his injury, he noticed that the conveyor belt started to run crooked, which indicated that mulch had accumulated and needed to be cleared. He stopped the debarker, but the conveyor belts remained running as his employer instructed. After cleaning the area, he stood up and his left glove became caught in a roller. He did not recall any warning signs at the end of the conveyor belt where he was hurt.
 {¶ 11} Appellants also submitted Dr. Igor L. Paul's expert affidavit that stated "Aldridge was using the debarker and conveyor belts in a reasonably foreseeable manner when the incident occurred." Dr. Paul opined that "[t]he area where the incident occurred (at the transfer point between the horizontal debarker mulch collecting conveyor and the take-up end of the inclined waste conveyor) could not have been effectively and efficiently cleared of mulch if the conveyor belts were turned off while the machines were being cleaned. Normal tail pulley side guards on the inclined conveyor would have allowed safe cleaning of this area without shutting down the conveyors." He opined that Reckart deviated from the standard of care applicable to conveyor belt manufacturers. "The Safety Standards for Conveyors and Related Equipment" established by the American Society of Mechanical Engineers (ASME) set forth the recommended minimum standards for conveyor belts." Section 5.9.3. states that "[i]n general, nip and shear points shall be guarded unless other means to assure safety are provided." Section 6.1.1, which relates to conveyor belts, states:
"(a) Nip and shear points shall be guarded. Typical locations are:
(1) at terminals, drives, take-ups, pulleys, and snub rollers where the belt changes directions;
(2) where belts wrap around pulleys;
(3) at the discharge end of a belt conveyor;
(4) on transfers and deflectors used with belt conveyors;
(5) at take-ups."
He stated that "the two belt conveyors supplied by Reckart Equipment were defective, did not meet minimum accepted industry safety standards and practices, and were inherently and unreasonably dangerous." Dr. Paul additionally averred that Reckart failed to guard the in running nip points:
"This area must always be guarded according to the industry standards, and by common industry safety practice, and is usually guarded by the conveyor manufacturer regardless of what industry the conveyor is used in (including the lumber and wood processing industries). In my forty years of consulting with the lumber and wood processing industries, I have never before encountered a belt conveyor which was not guarded in that area by the manufacturer of the conveyor. [Reckart's] claim that in the lumber industry conveyors of this type are often shipped without being completely guarded because the use configuration is not known to the conveyor manufacture, is not true for this area of the conveyor. Although transition area guarding is usually left to the user of a belt conveyor * * *, this accident and injury did not occur in the unguarded transition area, but at the unguarded in-running nip between the belt and the tail pulley (not the area between the belt and the ground as indicated by [Reckart's] expert). This area of the conveyor must always be guarded by the conveyor manufacturer regardless of its use in an overall system."
Dr. Paul further opined that the conveyor system did not have adequate warnings located near the tail pulley. Dr. Paul stated that Reckart failed to warn its customer what guards to add before using the equipment. Dr. Paul opined that it is Reckart's duty to recognize the risks of improper guarding and to install proper guarding: "It is not the standard in the lumber industryfor the purchaser of belt conveyors to be responsible forguarding this particular area of the conveyor." (emphasis added)
 {¶ 12} In reply, Reckart argued that it is not responsible for placing guards on the conveyor system. Reckart acknowledged that both sides presented evidence regarding guarding responsibility, but claimed that "there is one uncontroverted and indisputable fact[:] the conveyors and debarker supplied by Reckart required installation and some assembly by Aldridge's employer before they were operational." Reckart asserted that because the employer installed and assembled the system, it had no duty to provide guards on the conveyor system. Relying onSikorski v. Link Electric Safety Control Co. (1997),117 Ohio App.3d 822, 831, 691 N.E.2d 749, Reckart argued that "any defect that develops on machinery after it is delivered to a plaintiff's employer by reason of work done on the machine by the employer (such as installation) cannot be attributed to the manufacturer." Reckart further argued that Aldridge's statement that he was not aware of any danger associated with clearing mulch from the conveyor system "is absurd." Reckart asserted that "Aldridge's failure to recognize the obvious peril he was placing himself in by sticking his hand into a moving machine cannot be construed to be anything else than a failure to use common sense for one's own self-protection." Reckart also claimed that Dr. Paul's affidavit does not create a genuine issue of material fact because it is "filled with legal conclusions."
 {¶ 13} The trial court granted Reckart's summary judgment motion. The court first determined that Reckart did not have a duty to place guards on the conveyor. The court referred to Reckart's warranty information that stated that the owner had the responsibility to ensure that proper guarding was in place. The court also found that Reckart's warranty information "is consistent with the industry standard in the lumber industry for owners of sawmills to be responsible for guarding moving shafts on debarkers and similar equipment since it is not until the machinery is assembled and configured at the saw mill before it is possible to ascertain what guards are appropriate for the protection of the employees." Here, it appears that the trial court weighed the evidence concerning this finding in light of Dr. Paul's affidavit that this is not the industry standard. The court thus concluded that Reckart is not liable because the employer assembled and installed the conveyor system and introduced the defect (i.e., the unguarded nip point), that appellants could not prevail on any of their product liability claims, and that appellants did not produce evidence to establish a prima facie case for any of their remaining claims.
 {¶ 14} The court also concluded that Reckart established affirmative defenses that completely bar appellants' claims. The court concluded that Aldridge's use of the product constituted an unforeseeable misuse and that he assumed the risk of injury. This appeal followed.
 {¶ 15} In their sole assignment of error, appellants assert that the trial court erred by granting summary judgment in appellee's favor. Appellants contend that genuine issues of material fact exist regarding their strict and common law product liability claims: (1) whether the product was defective in design under the consumer expectation test or risk-benefit test; (2) whether the product was defective for failure to warn; (3) whether Reckart negligently designed the product; and (4) whether Reckart negligently failed to warn. Appellants also argue that genuine issues of material fact exist concerning proximate cause. They assert that whether Aldridge or Aldridge's employer's conduct constitute an intervening or superseding cause and whether a person unforeseeably misused a product or assumed the risk of injury are questions of fact, thus, summary judgment is inappropriate.
 I SUMMARY JUDGMENT STANDARD {¶ 16} When an appellate court reviews a trial court's summary judgment decision, the appellate court conducts a de novo review. See, e.g., Grafton v. Ohio Edison Co. (1996),77 Ohio St.3d 102, 105, 671 N.E.2d 241. Thus, appellate courts must independently review the record to determine if summary judgment was appropriate, an appellant court need not defer to a trial court's decision. See Brown v. Scioto Bd. of Commrs. (1993),87 Ohio App.3d 704, 711, 622 N.E.2d 1153; Morehead v. Conley
(1991), 75 Ohio App.3d 409, 411-12, 599 N.E.2d 786. Thus, to determine whether a trial court properly granted a summary judgment motion, appellate courts must review the Civ.R. 56 standard.
Civ.R. 56(C) provides in pertinent part:
* * * * Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor.
Thus, trial courts may not grant a summary judgment unless the evidence demonstrates that: (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made. See, e.g.,Vahila v. Hall (1997), 77 Ohio St.3d 421, 429-30,674 N.E.2d 1164. "[T]rial courts should award summary judgments with caution, being careful to resolve doubts and construe evidence in favor of the nonmoving party." Leibreich v. A.J. Refrigeration,Inc. (1993), 67 Ohio St.3d 266, 268, 617 N.E.2d 1068.
 {¶ 17} Under Civ.R. 56, the moving party bears the initial burden to inform the trial court of the motion's basis, and to identify those portions of the record that demonstrate the absence of a material fact. Vahila, supra; Dresher v. Burt
(1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264, 273. The moving party cannot discharge its initial burden with a conclusory assertion that the nonmoving party has no evidence to prove its case. See Kulch v. Structural Fibers, Inc. (1997),78 Ohio St.3d 134, 147, 677 N.E.2d 308, 318; Dresher, supra. Rather, the moving party must specifically refer to the "pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any," which affirmatively demonstrate that the nonmoving party has no evidence to support the nonmoving party's claims. Civ.R. 56(C); Dresher, supra.
 {¶ 18} "[U]nless a movant meets its initial burden of establishing that the nonmovant has either a complete lack of evidence or has an insufficient showing of evidence to establish the existence of an essential element of its case upon which the nonmovant will have the burden of proof at trial, a trial court shall not grant a summary judgment." Pennsylvania LumbermansIns. Corp. v. Landmark Elec., Inc. (1996), 110 Ohio App.3d 732,742, 675 N.E.2d 65. Once the moving party satisfies its burden, the nonmoving party bears a corresponding duty to set forth specific facts to show that a genuine issue exists. Civ.R. 56(E);Dresher, supra.
 {¶ 19} In responding to a summary judgment motion, the nonmoving party may not rest on "unsupported allegations in the pleadings." Harless v. Willis Day Warehousing Co. (1978),54 Ohio St.2d 64, 66, 375 N.E.2d 46, 47. Instead, Civ.R. 56 requires the nonmoving party to respond with competent evidence that demonstrates the existence of a genuine issue of material fact. Specifically, Civ.R. 56(E) provides:
* * * * When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the party does not so respond, summary judgment, if appropriate, shall be entered against the party.
Consequently, once the moving party satisfies its Civ.R. 56 burden, the nonmoving party must demonstrate, by affidavit or by producing evidence of the type listed in Civ.R. 56(C), that a genuine issue of material fact remains for trial. A trial court may grant a properly supported summary judgment motion if the nonmoving party does not respond, by affidavit or as otherwise provided in Civ.R. 56, with specific facts showing that there is a genuine issue for trial. Dresher, supra; Jackson v. AlertFire Safety Equip., Inc. (1991), 58 Ohio St.3d 48, 52,567 N.E.2d 1027.
 II PRODUCTS LIABILITY CLAIM {¶ 20} A products liability plaintiff must prove: "`(1) There was, in fact, a defect in the product manufactured and sold by the defendant; (2) such defect existed at the time the product left the hands of the defendant; and (3) the defect was the proximate cause of the plaintiff's injuries or loss.'" Temple,50 Ohio St.2d at 321, quoting State Auto Mutual Ins. Co. v. ChryslerCorp. (1973), 36 Ohio St.2d 151, 304 N.E.2d 891. A plaintiff may assert both common law and statutory product liability claims.[2] See Cincinnati v. Beretta U.S.A. Corp.,95 Ohio St.3d 416, 2002-Ohio-2480, 768 N.E.2d 1136; Carrel,78 Ohio St.3d 284, paragraph one of the syllabus. Under the product liability statutes, a product may be defective (1) in manufacture or construction, (2) in design or formulation, (3) due to inadequate warning or instruction, or (4) because the product does not conform to the manufacturer's representations. See R.C.2307.74 to 2307.77.
 A GENUINE ISSUES OF MATERIAL FACT REMAIN REGARDING WHETHER THE DEFECT EXISTED AT THE TIME IT LEFT THE MANUFACTURER'S CONTROL {¶ 21} Both appellants and appellee appear to agree that whether the alleged defect existed when it left appellee's hands is the threshold issue in the case at bar. Therefore, we first address that issue.
 {¶ 22} Appellants first focus upon the trial court's conclusion that Aldridge's employer caused the defect. They concede that appellee cannot be liable if Aldridge's employer (Smith) modified the machinery and if that modification caused Aldridge's injuries. They assert, however, that this is not the situation. Appellants contend that Smith installed and assembled completed conveyors that lacked appropriate guards, which rendered them defective regardless of how Smith installed or assembled them. They argue that Smith did not modify the conveyors by removing or by adding any guards. Thus, appellants contend that the trial court's conclusion that the employer introduced the defect is erroneous.
 {¶ 23} "The product liability statutes provide that the product is defective only if the defect existed when it left the control of its manufacturer.'" Sikorski v. Link Electric andSafety Control Co. (1997), 117 Ohio App.3d 822, 830,691 N.E.2d 749. "Any defect that develops on machinery after it is delivered to a plaintiff's employer by reason of work done on the machine by the employer (such as installation) cannot be attributed to the manufacturer. Keet v. Serv. Machine Co. (C.A.6, 1972),472 F.2d 138, 140. Even when a manufacturer ships a product unassembled, `knowing that a third party will complete the assembly process, the manufacturer cannot be held liable for a defect introduced by that third party.'" Id. at 831, quotingGrover Hill Grain Co. v. Baughman-Oster, Inc. (C.A.6, 1984),728 F.2d 784, 789.
 {¶ 24} Moreover, "a claim for strict liability in tort cannot be maintained if there has been a material alteration to the defective product once it has left the manufacturer's control, and if this material alteration significantly contributed to the plaintiff's injury." Kobza v. General Motors Corp. (1989),63 Ohio App.3d 742, 745, 580 N.E.2d 47. "[A] substantial alteration subsequent to the manufacture and sale of the product will relieve the defendant-manufacturer from liability and will support summary judgment in favor of the manufacturer." Cox v.Oliver Machinery Co. (1987), 41 Ohio App.3d 28, 30-31,534 N.E.2d 855. A material or substantial alteration "is defined as any change which increases the likelihood of a malfunction, which is the proximate cause of the harm complained of, and which is independent of the expected and intended use to which the product is put." Kobza, 63 Ohio App.3d at 745.[3]
 {¶ 25} In Sikorski, the court concluded that the manufacturer could not be liable when the employer substantially altered the machine. In Sikorski, the plaintiff suffered injuries while operating an 800-ton metal stamping press. Danly Machine Company manufactured and sold the stamping press to General Motors Corporations in 1956. In 1988, Tool Producers, Inc. purchased the press from a used machinery dealer. It then installed and retrofitted the machine. In so doing, it completely disassembled the press and then rebuilt it. Tool Producers replaced many component parts and installed a presence-sensing electronic device called a "Link Lite" that Link Electric and Safety Control Company manufactured to safeguard the point of operation. The "lite" created a vertical electronic "sensing field" in front of the point of operation that, when interrupted, sent a stop signal to the press to stop it from operating before something or someone entered the point of operation. At some point, however, Tool Producers disabled a Link Lite. InSikorski, "[t]here [was] no contention of a defect in the Link Lite product when it was acquired by Tool Producers. In fact, the Link Lites were properly installed by Tool Producers, but later Tool Producers disconnected the lower Link Lite to speed up production." 117 Ohio App.3d at 830-31. Instead, the injury occurred because the employer substantially altered the product by disabling the safety device. The court thus affirmed the trial court's summary judgment in Link's favor.
 {¶ 26} We believe that the facts in the case at bar are not similar to Sikorski. In Sikorski, the employer disabled a non-defective safety device. In the case sub judice, appellants presented evidence to suggest that the conveyor, as manufactured, is defective because it lacked appropriate guards when it left appellee's control. Unlike Sikorski, no evidence suggests that the employer altered the conveyor itself or removed safety guards from the conveyor.
 {¶ 27} In Kobza v. General Motors Corp. (1989),63 Ohio App.3d 742, 580 N.E.2d 47, the court concluded that the manufacturer could not be liable when a third party altered the product after it left the manufacturer's control. In Kobza, the trial court directed a verdict in GM's favor on the plaintiff's strict product liability in tort claim for defective design of a 1976 Chevrolet Camaro. The plaintiff suffered injuries when an automobile shop employee started the Camaro which then lurched forward, crushing the plaintiff's leg. The plaintiff alleged that the Camaro was defectively designed because the employee was able to start the car with the transmission in drive, even though the transmission was automatic.
 {¶ 28} When GM manufactured the Camaro, it was equipped with a neutral safety switch that prevented the engine from starting unless the transmission was in park or neutral. However, a post-accident inspection revealed that the transmission's external linkage that contained the neutral safety switch was missing. As a result, an operator could start the engine when the transmission was in either the drive or reverse. The plaintiff's expert testified that the linkage parts did not fall off in normal usage and that someone must have manually removed the parts. At the close of the plaintiff's case GM moved for a directed verdict and argued that a substantial change in the condition of the Camaro from the time it had been sold caused the plaintiff's injuries. The trial court granted the motion.
 {¶ 29} On appeal, the court noted that "a claim for strict liability in tort cannot be maintained if there has been a material alteration to the defective product once it has left the manufacturer's control, and if this material alteration significantly contributed to the plaintiff's injury."63 Ohio App.3d at 745. The court noted that it was "undisputed that the entire linkage system was missing from the Camaro. [The plaintiff's] expert testified that someone must have manually removed the linkage system as it was unlikely that the entire system would have completely fallen off during normal usage."63 Ohio App.3d at 745. Thus, because the product was not in the same condition it was when it left GM's control, the appellate court affirmed the trial court's directed verdict.
 {¶ 30} We believe that the Kobza facts are not similar to the case at bar. In Kobza, someone removed a car part. In the case sub judice, by contrast, no allegation exists that the employer or any third party removed any part from the conveyor so as to render it unsafe. See Behanan v. Desco Distribution Co.
(1994), 98 Ohio App.3d 23, 647 N.E.2d 830 (refusing to impose liability for defective product when a third party disabled a safety device on the allegedly defective product and when the evidence showed that the product was not defective when delivered to the end user); Burrows v. Fastener Engineers, Inc. (1992),78 Ohio App.3d 388, 393, 604 N.E.2d 838 (stating that the manufacturer "cannot be held liable where it had no knowledge, let alone control, over a subsequent substantial change" when the end user removed a guard that was on the product when it left the manufacturer).
 {¶ 31} In Cox v. Oliver Machinery Co. (1987),41 Ohio App.3d 28, 534 N.E.2d 855, the court determined that a jury question existed when the evidence showed that either an original design defect or a substantial alteration proximately caused the plaintiff's injuries. In Cox, the plaintiff suffered injuries while operating a saw that the defendant manufactured. The plaintiff's injuries occurred when the saw miscycled or "double-cycled" during its automatic mode while the plaintiff attempted to remove a piece of aluminum from the blade area. The defendant argued that the saw miscycled because the plaintiff's employer substantially altered it. "[The defendant] claimed that [the employer] made substantial changes to the saw by replacing key electrical switches with improper substitutes. According to [the defendant], these changes caused the saw to miscycle during its automatic mode, resulting in [the plaintiff's] injuries. The substantial changes, [the defendant] argues, relieve it of any liability under the temple decision. However, [the plaintiff] countered with evidence that `routine maintenance,' including the replacement of the switches in question, could be performed by [the employees]. Accordingly the types of repair performed by [the employer] were foreseeable * * * and any substantial alterations by [the employer] should not, according to [the plaintiff], relieve [the defendant] of strict liability. Furthermore, [the plaintiff] contends that any substantial alterations do not absolve [the defendant] since the claimed design defect, i.e., lack of adequate point-of-operation guards, existed in an unaltered portion of the saw which had not been repaired or changed by [the employer]." 41 Ohio App.3d at 32.
 {¶ 32} The appellate court determined that the trial court did not err by overruling the defendant's directed verdict motion: "[The plaintiff]'s expert testified that the saw's design was defective due to lack of adequate point-of-operation guards. The lack of adequate and sufficient guards contributed to [the plaintiff]'s injuries since it was foreseeable that the saw's operator would place his hands in the saw's danger zone. [The defendant]'s expert even acknowledged that the existing guards on the saw would not have prevented [the plaintiff] from placing his hand in the danger zone. Thus, * * * we have a case where there is evidence of both an original design defect and a substantial alteration, both of which are asserted as proximate causes of the accident." 41 Ohio App.3d at 32-33. Thus, Cox is similar to the case at bar because evidence exists that the conveyor, like the saw in Cox, lacked appropriate guards when it left the manufacturer's control. Like Cox, some evidence exists in the case sub judice of an original design defect.
 {¶ 33} Additionally, it appears that the parties' experts apparently do not agree on the precise point where the injury occurred. On summary judgment, we must construe the evidence most favorably to appellants. Thus, at this juncture we must presume that the injury occurred where Dr. Paul stated that it occurred. According to his affidavit, the injury occurred at the unguarded in running nip point between the conveyor belt and the tail pulley. This area was unguarded when it left Reckart's control and assuming that this unguarded point constitutes a defect (which we discuss next), the defect existed when the product left Reckart's control. Appellants' evidence shows that the conveyor itself was defective because it lacked a guard, not that it was rendered defective only by its integration into the debarking system or by the employer's substantial alteration of the conveyors.
 {¶ 34} Further, no evidence exists that Aldridge's employer substantially altered the product. Instead, the employer assembled the conveyors, which were unguarded at the location where Aldridge's injury occurred when the conveyors left Reckart's control. Thus, appellants have presented some evidence to show that the manufactured components are, in and of themselves, defective. A manufacturer may not be absolved of liability when a third party installs or assembles an already defective product.
 {¶ 35} Therefore, we believe that appellants' assertion that genuine issues of material fact remain regarding whether Aldridge's employer introduced the defect has merit. Under the second prong of the product liability test, genuine issues of material fact remain as to whether the defect existed when it left appellee's control and we believe that the trial court erred by concluding otherwise.
 B GENUINE ISSUES OF MATERIAL FACT REMAIN REGARDING WHETHER APPELLEE'S PRODUCT CONTAINED A DEFECT {¶ 36} Appellants further argue that genuine issues of material fact exist regarding whether the conveyor was defective in design under R.C. 2307.75. In particular, they contend that genuine issues remain regarding whether: (1) the machine was more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner; and (2) the foreseeable risks associated with its design exceeded the benefits associated with the design.
 {¶ 37} Under R.C. 2307.75, a product is defective in design if: (1) it is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner; or (2) if the foreseeable risks associated with its design exceed the benefits. See, also, Knitz v. Minster Machine Co.,69 Ohio St.2d 460, 432 N.E.2d 814; Cremeans v. Internatl. Harvester Co.
(1983), 6 Ohio St.3d 232, 452 N.E.2d 1281, syllabus. "`Section2307.75 allows the trial court to apply one or another, or both, of two distinct "design defect" standards. The plaintiff can choose to proceed under one or both tests.'" (Footnote omitted.) O'Reilly Cody, Ohio Products Liability Manual (1992) 70-71, Section 6.08." Perkins v. Wilkinson Sword, Inc. (1998),83 Ohio St.3d 507, 509, 700 N.E.2d 1247.
 {¶ 38} "Foreseeable uses of a product, foreseeable risks associated with a product, benefits associated with a product, and consumer expectations regarding a product's uses and risks are ordinarily all factual questions. The determination whether a design defect exists involves a balancing of these factual issues. Therefore, summary judgment will rarely be granted in design-defect cases when any of these elements is disputed."Welch Sand Gravel, Inc. v. O K Trojan, Inc. (1995),107 Ohio App.3d 218, 225, 668 N.E.2d 529.
 1. CONSUMER EXPECTATION TEST {¶ 39} Appellants first claim that appellee's product is defective in design because it is more dangerous than an ordinary consumer would expect. They assert that Aldridge was unaware of any danger associated with the conveyor or in using it in the manner his employer instructed him. Aldridge testified that he did not think the debarker was dangerous or that his work was dangerous.
 {¶ 40} Appellee argues that the consumer expectation test does not apply because the product was not marketed to the public. It asserts: "[T]he Consumer Expectation Test is wholly inapplicable in situations where the product is a non-consumer product that is not marketed to the public. This principle of law is based on the fact that, in order to apply a Consumer Expectation Test analysis, there must be proof that ordinary and average consumers have established fairly definite expectations of the product's performance in the public arena. A debarker and accompanying conveyors are simply not products marketed to the consumer public such that a reasonable juror could ever determine what the normal consumer has come to expect with regard to the product's performance." Appellee additionally argues that the consumer expectation test "seems appropriate only for cases involving products of simple design." Appellee further contends that even if the consumer expectation test applies, Aldridge cannot show that the product was defective under the test because: (1) he was not using the product in an intended and reasonably foreseeable manner; and (2) an ordinary consumer would recognize that injury would result by sticking one's hand into the machine.
 {¶ 41} Initially, we disagree with appellee that in the case sub judice the consumer expectation test does not apply because the product (the conveyor) was not marketed to a consumer, but to a company. "Recent cases and commentaries have suggested that the consumer expectation test fails to provide an adequate legal standard in design defect cases involving nonconsumer products, since the consumer would not know what to expect, not knowing how safe the product could be made." Pruitt v. Gen. Motors Corp.
(1991), 74 Ohio App.3d 520, 525, 599 N.E.2d 723 (citations omitted). We, however, are unable to locate Ohio cases that refuse to apply the consumer expectation test when the product is sold to a company for use in a business rather than directly to a consumer. Pruitt declined to answer the question but assumed that the test would apply. Ohio courts appear to routinely apply the test, even in workplace settings, when the product is marketed, not to the consuming public in general, but to a company. See Cicchillo v. A Best Products Co., Cuyahoga App. No. 79288, 2002-Ohio-4 (applying consumer expectation test when the product was sold to a company and the plaintiff-employee used the product in his employment); Colboch v. Uniroyal Tire Co.,Inc. (1996), 108 Ohio App.3d 448, 456, 670 N.E.2d 1366; see, also, Cobos v. Ray-Go Wagner (C.A.9, 1994), 15 F.3d 1083 (stating that the focus of the consumer expectation test is on whether the hazard is unexpected, not whether the consumer is ordinary).
 {¶ 42} Second, we disagree with appellee that the test is appropriate only for products of simple design. "The consumer-expectation test focuses on the expectation of performance, not the technical considerations of the product."Hisrich v. Volvo Cars of N. America (C.A.6, 2000),226 F.3d 445, 455. Thus, "the consumer need not be able to contemplate the technical considerations of the product's design to find the product defective under the consumer-expectation test." Id.
 {¶ 43} Hisrich rejected an argument similar to the one appellee raises that the consumer expectation test does not apply when the product is a supposedly complicated non-consumer device. In Hisrich, the product was a vehicle air bag. The court explained:
"In Sours v. General Motors Corp., we rejected the defendant's argument that the Ohio consumer-expectation test was inapplicable to a vehicle because of a lack of consumer expectation with respect to a one-vehicle, roll-over accident in which plaintiff alleged a defect in the roof design. See717 F.2d 1511, 1515-16 (6th Cir. 1983). The Sours court found that the trial court properly instructed the jury on the consumer-expectation test and held that the risk-benefit test did not `eclipse the consumer-expectation standard; rather it was intended to serve as a refinement of that general principle in those situations where expectations were likely to be distorted.' Id. at 1515; see also Colboch v. Uniroyal Tire Co.,108 Ohio App.3d 448, 670 N.E.2d 1366, 1371 (Ohio Ct.App. 1996) (applying consumer-expectation test to explosion of vehicle tire and stating that test focuses on `whether the hazard is unexpected'). In Leichtamer v. American Motors Corp., the Ohio Supreme Court applied the consumer-expectation test to the plaintiff's claim that a roll bar of a jeep was defective when it failed during a pitch-over accident on off-road terrain. See 424 N.E.2d at 576. The court reasoned that a consumer, expecting to use the vehicle on off-road terrain as advertised by the defendant, could establish an expectation in the product's performance. See id.
The Ohio Supreme Court has stated that the consumer-expectation test may fail to reach product defects when the consumer `is ignorant of the product and has no expectation of its safety, or where a new product is involved and no expectation of safety has developed.' Knitz v. Minster Machine Co., 69 Ohio St.2d 460,432 N.E.2d 814, 818 (Ohio 1982); see also Pruitt v. GeneralMotors Corp., 74 Ohio App.3d 520, 599 N.E.2d 723, 726 (Ohio Ct.App. 1991) (finding that the defect must be within the realm of the common consumer understanding in applying consumer-expectation test). The Knitz court, however, clarified this observation, noting that such instances arise when `the injured party is an innocent bystander who is ignorant of the product' or when new users have developed no expectation of product performance. See id. at 818. Neither situation is present in this case. Moreover, the Knitz court did not deem the consumer-expectation test inapplicable in cases where the injured is ignorant, but instead noted that the test would not produce a defect because the plaintiff would not have any performance expectation. See id.; see also Pruitt, 599 N.E.2d at 726
(applying consumer-expectation test but finding that consumer could not expect a product performance which contemplated plaintiff's specific use of the product)."
Hisrich, 226 F.3d at 455-56.
 {¶ 44} The court concluded: "[W]e are unpersuaded by defendants' citation to other jurisdiction's cases in which courts have rejected the consumer-expectation test as inapplicable to complicated non-consumer devices, such as vehicular airbags. Under Ohio law, the issue is not whether the consumer can determine the reasonable expectations for the technical operation of the product, but the consumer's reasonable ability to expect the performance of the product. See Sours,717 F.2d at 1515-16; Leichtamer, 424 N.E.2d at 576; Colboch,670 N.E.2d at 1371." Hisrich, 226 F.3d at 456 (footnote omitted).
 {¶ 45} Thus, the consumer expectation test may, in fact, apply to the case at bar and we now consider whether genuine issues of material fact exist regarding that test.
 {¶ 46} A product is defective in design if it is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. R.C. 2307.75(A)(2); see, also, Leichtamer, paragraph two of the syllabus; Knitz,
syllabus; Cremeans, syllabus. The consumer expectation test reflects the commercial reality that implicit in a product's presence on the market is a representation that the product will safely perform the job for which it was constructed. Knitz,
supra. This is an objective standard, not the subjective expectations of a particular user or consumer. Leichtamer v.American Motors Corp. (1981), 67 Ohio St.2d 456, 467,424 N.E.2d 568. Generally, the question of what an ordinary consumer expects is one for the trier of fact. See Welch Sand Gravel, Inc. v. O K Trojan, Inc. (1995), 107 Ohio App.3d 218, 225,668 N.E.2d 529; see, also, Hisrich v. Volvo Cars of North America, Inc.
(C.A.6, 2000), 226 F.3d 445, 455 (stating that "`the determination of whether a product is more dangerous than an ordinary person would expect is generally a question of fact.'" (quoting Fisher v. Ford Motor Co. (N.D.Ohio 1998),13 F.Supp.2d 631, 638 n. 10); Porter v. Gibson Greetings, Inc. (Dec. 2, 1997), Montgomery App. No. 16575. "[U]nder the consumer-expectation standard, evidence of unsafe, unexpected product performance is sufficient to infer the existence of a product defect." Mullins v. Clark Equipment Co. (Oct. 26, 1994), Montgomery App. No. 14426.
 {¶ 47} In the case sub judice, we believe that appellants have produced evidence to show that genuine issues of material fact remain concerning whether the product is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. Although the test is not subjective, that Aldridge stated that he did not expect that injury could result by clearing the mulch from under the conveyors while the conveyors were moving. Furthermore, whether a product is more dangerous than an ordinary consumers expect is generally a question of fact and is not appropriately determined upon a summary judgment motion. Welch, supra.
 {¶ 48} We disagree with appellee that Aldridge, by cleaning the accumulated mulch from the intersection of the two conveyors, did not use the product in an intended and reasonably foreseeable manner. Aldridge did not, as appellee asserts, simply stick his hand into the moving conveyor. Instead, as he cleared the mulch his hand became caught in the conveyor belt. Whether he used the machine in an intended and reasonably foreseeable manner is a question of fact. Welch, supra. We additionally note that appellants' expert opined that Aldridge used the machine in a reasonably foreseeable manner.
 {¶ 49} Consequently, genuine issues of material fact remain as to whether appellee's product is defective in design under the consumer expectation test.
 2. RISK BENEFIT TEST {¶ 50} Appellants next argue that the trial court erred by determining that genuine issues of material fact do not exist regarding whether the product is defective under the risk benefit test. They contend:
"The risks associated with the design of the conveyor belts when it left Appellee w[ere] very grave: a user may get a body part caught in the unguarded conveyor. A jury could reasonably conclude that it is unlikely Mr. Aldridge would be aware of the danger associated with this particular area of the conveyor because: (1) he was performing his job in the manner his employer demonstrated to him; (2) the area of the conveyor is typically guarded by a manufacturer, thereby allowing for safe cleaning even if it is in motion; and (3) some portions of the conveyor were guarded by Appellee, which would give the user false confidence that all dangerous portions of the conveyor were guarded. Additionally, * * * the conveyor did not comply with the standards in the lumber industry or national ASME standards."
Appellants further argue that "[t]here is no benefit associated with the failure to guard this area of the conveyor" and a guard would not have interfered with the operation of the conveyor. They contend that placing a guard on the area would not be technically impractical and the costs would not be significant. Appellants dispute appellee's claim that the product was not defective under the risk benefit test because appellee could not have foreseen that the conveyor would remain in operation while employees cleared mulch from the intersection of the two conveyors. They assert that whether appellee should have foreseen this use is a jury question that cannot be resolved on summary judgment. Appellants also refer to Dr. Paul's affidavit that states that employees could not have effectively and efficiently cleared the intersection of mulch if the conveyor belts were turn off. Dr. Paul opined: "It was certainly known and foreseeable to [appellee] that the unguarded tail area would have to be periodically cleaned of whatever bulk material the conveyor was used * * * and it was also known to them that effective cleaning of the tail pulley requires some conveyor motion."
Appellee evaluates the risk-benefit factors as follows:
"The intended and reasonably foreseeable use of the debarker and conveyor system is to engage the machinery to remove bark from cut trees so they can be processed into lumber. The machinery must be shut down to perform operational maintenance in any of the components, including cleaning of debris. If proper procedures for performing routine cleaning maintenances (i.e., shutting down the conveyor) are adhered to, the nature and magnitude of the risks of harm associated with maintenances (and particularly the risk of a hand or arm being pulled into the machine and crushed) is non-existent or minuscule. A reasonable product user with experience in the industry would undoubtedly be aware (beyond `likely awareness') of the non-existent risk associated with the proper maintenance routine (i.e., shutting it down), as well as an awareness of the inherent risk of injury attendant with sticking a hand and arm into or around a moving conveyor. Reasonable minds can only find that there is no likelihood that [appellee's] component parts would cause such injury if the conveyor system is properly shut down to clean out mulch or debris build-up. Finally, it is undisputed that it is the industry standard in the lumber industry for owners of sawmills to be responsible for guarding moving shafts on debarkers and similar equipment.
Furthermore, the performance advantages associated with a conveyor system conferred a benefit on the lumber industry. Certainly, a performance advantage can only be accomplished by a conveyor system to mechanically feed the logs into the debarker component and then remove the mulch from the debarking operation. Aldridge is also unable to prove that a practical and technically feasible design (a) was available, (b) would have prevented this accident, (c) would not substantially impair the equipment's usefulness, (d) was economically feasible, and (e) would practically reduce the magnitude of the inherent risk of catastrophic injury in cleaning out operating equipment."
Appellee claims that to prove the availability of a technically feasible alternative, appellants must use expert testimony which requires more than "bald and speculative assertions of an alternative design."
 {¶ 51} Under R.C. 2307.75(A)(1), a product is defective if "the foreseeable risks associated with its design * * * exceed the benefits associated with that design." R.C. 2307.75(B) sets forth factors that courts must consider to assess the foreseeable risks of a product design:
(1) The nature and magnitude of the risks of harm associated with that design or formulation in light of the intended and reasonably foreseeable uses, modifications, or alterations of the product;
(2) The likely awareness of product users, whether based on warnings, general knowledge, or otherwise, of those risks of harm;
(3) The likelihood that that design or formulation would cause harm in light of the intended and reasonably foreseeable uses, modifications, or alterations of the product;
(4) The extent to which that design or formulation conformed to any applicable public or private product standard that was in effect when the product left the control of its manufacturer.
R.C. 2307.71(F) defines "foreseeable risk" as follows:
(F) "Foreseeable risk" means a risk of harm that satisfies both of the following:
(1) It is associated with an intended or reasonably foreseeable use, modification, or alteration of a product in question;
(2) It is a risk that the manufacturer in question should recognize while exercising both of the following:
(a) The attention, perception, memory, knowledge, and intelligence that a reasonable manufacturer should possess;
(b) Any superior attention, perception, memory, knowledge, or intelligence that the manufacturer in question possesses.
"The test for determining whether a particular hazard is foreseeable is whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act. Menifee, supra. The question in a particular case is whether the actual harm fell within the general field of danger which should have been anticipated by the manufacturer. Holman v. Mark Industries,Inc. (1985, D.C. Md.), 610 F.Supp. 1195." Gilbert v. BayerischeMotoren Werke, A.G. (Dec. 17, 1993), Montgomery App. No. 13819. Thus, a plaintiff does not have to show that the manufacturer should have foreseen the very sequence of events that injured the plaintiff. Instead, a plaintiff must demonstrate that the manufacturer, using the attention, perception, memory, knowledge and intelligence of a reasonable manufacturer, should have anticipated the general danger to others posed by its chosen design. Id.
 {¶ 52} R.C. 2307.75(C) sets forth the following factors that courts consider when evaluating the benefits of a product design:
(1) The intended or actual utility of the product, including any performance or safety advantages associated with that design or formulation;
(2) The technical and economic feasibility, when the product left the control of its manufacturer, of using an alternative design or formulation;
(3) The nature and magnitude of any foreseeable risks associated with an alternative design or formulation.
* * *
 {¶ 53} In the case at bar, we believe that genuine issues of material fact remain regarding whether appellee's product was defective under the risk-benefit test. First, an unguarded conveyor belt pinch point carries a high risk of causing substantial harm to one who contacts the pinch point. Appellants and appellee have presented conflicting evidence concerning the intended and reasonably foreseeable uses of the product. Appellants assert that Aldridge used the product in an intended and reasonably foreseeable manner and support this assertion with Dr. Paul's affidavit. Second, genuine issues of material fact remain regarding product users' likely awareness of the risks of harm. Aldridge stated that he did not believe his use of the product carried a high risk that his arm would be pulled into the conveyor. Additionally, appellants contend that because the conveyor's slow movements could have caused Aldridge to believe that the risk of harm was low. Third, for these same reasons genuine issues of material fact remain concerning the likelihood that the unguarded conveyor belt would cause harm when users cleaned the accumulated mulch. Fourth, genuine issues of material fact remain regarding the extent to which the unguarded conveyor belt conformed to any applicable public or private product standard. Appellee contends that "it is undisputed that it is the industry standard in the lumber industry for owners of sawmills to be responsible for guarding moving shafts on debarkers and similar equipment." Appellants' expert, however, disagreed with this position and in fact stated otherwise. Thus, a trier of fact should evaluate and resolve conflicting evidence.
 {¶ 54} Genuine issues of material fact also remain regarding the product's benefits. The product has utility (i.e., it helps transfer mulch from one location to another) but whether leaving the pinch point unguarded has utility is a point that the parties dispute. The parties dispute whether adding a guard to the area where Aldridge's injury occurred is technically and economically feasible and whether an alternative design (guarding the pinch point) would carry the same type of risks associated with the product minus guarding.
 {¶ 55} We disagree with appellee that appellants were required to present expert testimony to show that an alternative design was technically feasible. The case appellee cites in support of its argument, Dent v. Ford Motor Co. (1992),83 Ohio App.3d 283, 285, 614 N.E.2d 1074, does not appear to stand for this proposition. In Dent, Ford argued that Dent needed expert testimony to support her product liability claims. The trial court gave Dent six weeks to respond to Ford's argument that she needed expert testimony and to show that genuine issues of material fact remain. When Dent failed to respond, the court granted Ford partial summary judgment.
 {¶ 56} Contrary to appellee's argument, Dent does not state that a party must present expert testimony to support a defective design claim under the risk-benefit test. Instead, Dent
recognized that when a party moving for summary judgment satisfies its initial burden and the non-moving party fails to respond, a trial court may grant summary judgment to the moving party. See Atkins v. General Motors (1999),132 Ohio App.3d 556, 564, 725 N.E.2d 727 (recognizing that Dent did not stand for the proposition that expert testimony is always required in design defect cases).
 {¶ 57} Although a plaintiff asserting a design defect claim may often present expert testimony in support of that claim, expert testimony is not always required to prove the elements of a design defect claim. See Atkins v. GMC (1999),132 Ohio App.3d 556, 564, 725 N.E.2d 727; Colbach v. Universal Tire Co.,Inc. (1996), 108 Ohio App.3d 448, 504, 670 N.E.2d 1366; GroverHill Grain Co. v. Baughman-Oster, Inc. (C.A.6, 1984),728 F.2d 784, 794. Although, expert testimony may be required if the existence of a technically feasible alternative design is knowledge beyond that possessed by the average lay person,Mullins v. Clark Equipment Co. (Oct. 26, 1994), Montgomery App. No. 14426, if a claim involves a simple device without complex features or designs, circumstantial evidence may be sufficient to establish that a defect existed. Atkins, supra. In Atkins,
the plaintiffs alleged that their van's cargo door hinges were defective in manufacture or construction, design or formulation, due to inadequate warning, and because they did not conform to the defendant's representations. The trial court awarded the defendant summary judgment when the plaintiffs failed to present expert testimony to establish their products liability claim. The appellate court disagreed that expert testimony is always necessary to prove a design defect claim: "While it will often be necessary for a plaintiff bringing a design defect claim to present expert testimony in support of that claim, expert testimony is not always required to prove the material elements of a design defect claim. In some cases, circumstantial evidence alone, without expert testimony, will suffice to document the existence of a design defect. In the case before us, neither the product nor its allegedly defective aspect is so complex as to require expert testimony as a matter of law."132 Ohio App.3d at 564 (citations omitted).
 {¶ 58} Similarly, in the instant case, the conveyor belt and the lack of guarding at the point where Aldridge's injury occurred are not so complex as to be beyond the knowledge of a lay person so as to require expert testimony. We do not believe that the technical feasibility of adding a guard to an unguarded conveyor is beyond the grasp of the average lay person. Thus, appellee's assertion that expert testimony is required is without merit.
 {¶ 59} Additionally, we believe that genuine issues of material fact remain regarding appellants' claim that appellee's product is defective in design under the consumer expectation or risk-benefit test.
 C GENUINE ISSUES OF MATERIAL FACT REMAIN REGARDING APPELLANTS' FAILURE TO WARN CLAIM {¶ 60} Appellants assert that the trial court erred by determining that no genuine issues of material fact remained regarding their common law negligent and statutory strict liability failure to warn claims. They dispute appellee's claim that it lacked any duty to warn because the danger of suffering injury from placing one's hand near a moving conveyor belt is an open and obvious danger that relieved it of a duty to warn. Appellants claim that whether the hazard constituted an open and obvious danger is a question of fact, and further point out that Aldridge stated that he was not aware of the danger.
 {¶ 61} Appellee argues that it "had no duty to warn Aldridge of the risk of physical injury from sticking his hand and arm into the nip point of the system because this is a danger of such common knowledge that it can be easily appreciated." Appellee asserts that Aldridge's common sense "should have told him not to stick his hand near a moving conveyor belt on the debarker system." Appellee further contends that it had no duty to warn because Aldridge lacks evidence that "at the time [appellee] distributed the debarker and conveyor it knew or should have known of an excessive and abusive pattern of industry-wide frequency of end-users performing maintenance on running debarking machines, and resulting incidents of catastrophic injury. Catastrophic injury resulting from cleaning of the debarker equipment by hand while the system is running was just simply not a meaningful and foreseeable risk or hazard, as a matter of law." Appellee also asserts that it did not have a duty to warn under the "component parts doctrine," which it claims provides that "a manufacturer has no duty to warn of dangers that may cause harm on integration of its component part(s) into an end product or system, where the manufacturer is not involved in the final product's design or assembly." Appellee thus argues that because it did not participate in the product design or assembly, it had no duty to warn.
 {¶ 62} The duty imposed upon a manufacturer in a strict liability action for failure to warn is the same as that imposed in a negligence failure to warn case. See Crislip v. TCHLiquidating Co. (1990), 52 Ohio St.3d 251, 256-57,556 N.E.2d 1177; Welch, 107 Ohio App.3d at 226. Thus, a plaintiff asserting either a negligent or strict liability failure to warn claim against a manufacturer must demonstrate that: (1) the manufacturer had a duty to warn; (2) the manufacturer breached that duty; (3) proximate cause; and (4) injury. See Freas v.Prater Construction Corp. (1991), 60 Ohio St.3d 6, 8-9,573 N.E.2d 27. Whether a manufacturer had a duty to warn is a question of law for the court to decide. See, e.g., Roberts v.Performance Site Mgmt., Franklin App. No. 03AP-784, 2004-Ohio-2820, at ¶ 10.
 1. DUTY a. Open and Obvious Dangers {¶ 63} A manufacturer does not have any duty to warn a product user of open and obvious dangers. "[I]f a manufacturer has reason to believe that consumers will realize the danger involved in using a product, then the manufacturer does not have a duty to warn of that danger. To this end, Ohio's appellate courts have determined that if a product's danger is a matter of common knowledge or if the danger is open and obvious to the user of the product, then the manufacturer has adequate reason to believe that the consumer will realize the product's danger and a duty to warn will not arise. Thus, * * * a manufacturer does not have a duty to warn of a product's danger if that danger is a matter of common knowledge or open and obvious to the user of the product." Hanlon v. Lane (1994), 98 Ohio App.3d 148, 153,648 N.E.2d 26 (citations omitted); see, also, Temple v. Wean United
(1977), 50 Ohio St.2d 317, 325, 364 N.E.2d 267 (stating that it is "futile to require that [a manufacturer] notify the employee of that which the responsible party, the employer, was already aware"); R.C. 2307.76(B) ("A product is not defective due to inadequate warning as a result of the failure to warn about an open and obvious risk or a risk that is common knowledge.").
 {¶ 64} In most situations, whether a danger is open and obvious presents a question of law. See Hallowell v. Athens,
Athens App. No. 03CA29, 2004-Ohio-4257, at ¶ 21; see, also,Nageotte v. Cafaro Co., Erie App. No. E-04-15, 2005-Ohio-2098. Under certain circumstances, however, disputed facts may exist regarding the openness and obviousness of a danger, thus rendering it a question of fact. As the court explained inKlauss v. Marc Glassman, Inc., Cuyahoga App. No. 84799,2005-Ohio-1306, at ¶¶ 17-20:
"Although the Supreme Court of Ohio has held that whether a duty exists is a question of law for the court to decide, the issue of whether a hazardous condition is open and obvious may present a genuine issue of fact for a jury to review.
Where only one conclusion can be drawn from the established facts, the issue of whether a risk was open and obvious may be decided by the court as a matter of law. Anderson v. HedstromCorp. (S.D.N.Y. 1999), 76 F.Supp.2d 422, 441; Vella v. HyattCorp. (S.D. MI 2001), 166 F.Supp.2d 1193, 1198; see, also,Parsons v. Lawson Co. (1989), 57 Ohio App.3d 49. However, where reasonable minds could differ with respect to whether a danger is open and obvious, the obviousness of the risk is an issue for the jury to determine. Carpenter v. Marc Glassman, Inc. (1997),124 Ohio App.3d 236, 240; Henry v. Dollar General Store, Greene App. No. 2002-CA-47, 2003-Ohio-206; Bumgarner v. Wal-MartStores, Inc., Miami App. No. 2002C-A-11, 2002-Ohio-6856.
As stated in Henry, supra: `We agree that the existence of a duty is a question of law for the court to decide. Mussivand v.David (1989), 45 Ohio St.3d 314, 318, 544 N.E.2d 265. As a result, whether a business owner owes a duty of care to protect customers against an open and obvious danger is for a court, not a jury, to resolve. Whether a given hazard is open and obvious, however, may involve a genuine issue of material fact, which a trier of fact must resolve.'
Attendant circumstances may create a genuine issue of material fact as to whether a danger was open and obvious. Quinn v.Montgomery County Educ. Serv. Ctr., Montgomery App. No. 20596,2005-Ohio-808; Collins v. McDonald's Corp., Cuyahoga App. No. 83282, 2004-Ohio-4074. While `there is no precise definition of "attendant circumstances" * * * they generally include any distraction that would come to the attention of [the plaintiff] in the same circumstances and reduced the degree of care an ordinary person would exercise at the time.' McGuire v. Sears,Roebuck and Co. (1996), 118 Ohio App.3d 494, 499 (citation omitted). Moreover, the phrase `attendant circumstances' refers to all facts relating to the event, such as time, place, surroundings or background and the conditions normally existing that would unreasonably increase the normal risk of a harmful result of the event. Menke v. Beerman (Mar. 9, 1998), Butler App. No. CA97-09-182, citing Cash v. Cincinnati (1981),66 Ohio St.2d 319."
See, also, Oliver v. Leaf and Vine, Miami App. No. 2004CA35,2005-Ohio-1910, at ¶ 31 ("`The determination of whether a hazard is latent or obvious depends upon the particular circumstances surrounding the hazard.'") (internal quotations omitted).
 {¶ 65} In the case at bar, we believe that genuine issues of material fact remain regarding whether the danger posed by cleaning the accumulated mulch was open and obvious so as to relieve appellee of liability for failure to warn. Aldridge stated that the conveyor belts moved slowly and he did not think engaging in this practice presented a danger. Further, his employer instructed him to clean the mulch in this manner. Aldridge could have assumed that cleaning the mulch with the conveyors operational did not pose any harm. Thus, under the facts present in the case sub judice, reasonable minds could differ as to whether cleaning the mulch with the conveyors operational constituted an open and obvious danger.
 {¶ 66} We disagree with appellee that our decision in Frost
requires us to find that common sense should have told Aldridge that cleaning the mulch posed a danger. First, Frost was not, as appellee asserts, a products liability case. Instead, it involved a cause of action under R.C. 4101.11 and 4101.12. Second, Frost was not a majority opinion and has limited precedential value. Third, we did not consider in Frost whether the danger was open and obvious, but instead whether the plaintiff had been engaged in inherently dangerous work at the time of his injury. Fourth, we did not hold, as appellee contends, that "an inherent danger is that which is open and obvious" or that "common sense dictates what is in fact an inherent danger making it open and obvious." Rather, we stated: "In the majority of cases discussing inherently dangerous work, common sense dictates that the work is inherently dangerous. SeeKomenovich v. AK Steel Corp. (Jan. 25, 1999), Butler App. No. CA98-08-172 (suggesting that inherent danger is one that is open and obvious)." Frost v. Dayton Power and Light Co. (2000),138 Ohio App.3d 182, 194-95, 740 N.E.2d 734. Thus, we find that appellee's reliance on Frost misplaced.
 {¶ 67} Consequently, we believe that in the case sub judice genuine issues of material fact remain regarding whether the hazard was open and obvious.
 b. THE COMPONENT PARTS DOCTRINE {¶ 68} Appellee nevertheless argues that it had no duty to warn of the dangers associated with the conveyors because it did not assemble or design the debarking system.
 {¶ 69} A manufacturer's duty to warn does not extend "to the speculative anticipation of how manufactured components, not in and of themselves dangerous or defective, can become potentially dangerous dependent upon their integration into a unit designed and assembled by another." Temple, paragraph four of the syllabus; see, also, Roberts, at ¶ 12 ("[P]ursuant to the `component parts doctrine,' a manufacturer generally has no duty to warn of dangers that may cause harm on integration of its component part or product into an end product or system, where the manufacturer is not involved in the final product's design or assembly."); Schaffer v. A.O. Smith Harvestore Products, Inc.
(C.A.6, 1996), 74 F.3d 722, 729; Brennaman v. R.M.I. Co.
(1994), 70 Ohio St.3d 460, 639 N.E.2d 425; Searls v. Doe
(1986), 29 Ohio App.3d 309, 312, 505 N.E.2d 287 (determining that manufacturers of component parts have "no duty to warn plaintiff of a potentially dangerous or defective design of a system, where defendants were not responsible for the design and manufacture of the entire system and where the component parts, not in and of themselves dangerous or defective, were manufactured in accordance with specifications"); Martinez v. Yoho's Fast FoodEquip., Franklin App. No. 02AP-79, 2002-Ohio-6757, ¶¶ 33-35 (finding no liability for a manufacturer whose component was not in and of itself dangerous or defective); Acme Steak Co. v.Great Lakes Mechanical (Sept. 29, 2000), Mahoning App. No. 98-CA-146 (finding a component part manufacturer was not subject to liability for the completed product where the manufacturer reviewed design drawings and specifications but was not involved in the design or construction of the integrated system). "[C]omponent parts suppliers are, `not required to procure plans of the entire system, review those plans, and independently determine whether their respective component parts would function in a safe fashion.'" Acme Steak Co., Inc. v. Great LakesMechanical Co. (Sept. 29, 2000), Mahoning App. Nos. 98-CA-146 and 98-CA-243, quoting Searls, 29 Ohio App.3d at 311. However, "[i]f a manufacturer has knowledge of a specific use of the component and a possible danger from such use, then the manufacturer has a duty to warn." Phan v. Presrite Corp.
(1994), 100 Ohio App.3d 195, 200, 653 N.E.2d 708.
 {¶ 70} In the case at bar, appellants alleged that the component part itself, i.e., the conveyor, is dangerous or defective. Appellants have not simply argued that the component part (the conveyor) became defective upon its integration into a completed system. Because appellants presented evidence that the conveyor is dangerous or defective due to its failure to have guards over the end pulley, the component parts doctrine does not relieve appellee of liability.
 {¶ 71} Consequently, we believe that genuine issues of material fact remain regarding whether appellee owed Aldridge a duty.
 2. BREACH {¶ 72} To establish that the manufacturer breached the duty to warn, the plaintiff must show that "`the manufacturer knew, or should have known, in the exercise of ordinary care, of the risk or hazard about which it failed to warn.'" Freas v. PraterConstruction Corp. (1991), 60 Ohio St.3d 6, 9, 573 N.E.2d 27, quoting Crislip v. TCH liquidating Co. (1990),52 Ohio St.3d 251, 257, 556 N.E.2d 1177; see, also, R.C. 2307.76(A)(1). A manufacturer is negligent when it knows of a latent defect which renders a product unsafe and fails to provide a warning. SeeTemple v. Wean United (1977), 50 Ohio St.2d 317, 325,364 N.E.2d 267. A manufacturer will not be liable unless the plaintiff shows "`that the manufacturer failed to take the precautions that a reasonable person would take in presenting the product to the public.'" Freas v. Prater Construction Corp.
(1991), 60 Ohio St.3d 6, 9, 573 N.E.2d 27, quoting Crislip v.TCH liquidating Co. (1990), 52 Ohio St.3d 251, 257,556 N.E.2d 1177. The manufacturer may discharge its duty "if the manufacturer exercises `* * * reasonable care to give those who are to use the chattel the information which the supplier possesses, and which he should realize to be necessary to make its use safe for them and those in whose vicinity it is to be used. * * *'" Freas, 60 Ohio St.3d at 9, quoting Section 388 of the Restatement of the Law 2d Torts (1965), comment g. "A warning is adequate if it reasonably discloses all inherent risks, and if the product is safe when used as directed." Phan v. PresritCorp. (1994), 100 Ohio App.3d 195, 200, 653 N.E.2d 708.
 {¶ 73} In the case at bar, genuine issues of material fact remain regarding whether appellee exercised reasonable care in warning of the risks associated with the conveyors. First, appellee has not argued on appeal that its warnings were adequate. Instead, it has limited its argument concerning the failure to warn claims to the open and obvious nature of the danger and the component parts doctrine. Second, Aldridge stated that he did not observe any warnings located near the area where his injury occurred. The conveyors did contain stickers that stated in bold capital letters: "Warning Do Not Operate This Machine Without Guards in Place." Appellee also issued a "Notice" that stated: "It is the duty and responsibility of all owners, foremen, and operators to see that all machines are properly guarded before any machine is declared ready for operation." However, no evidence exists that Aldridge knew of the warning and furthermore, appellants' expert stated that appellee's warnings were not adequate.
 {¶ 74} Thus, appellants have established that genuine issues of material fact remain regarding the duty and breach elements of their failure to warn claim. We address the proximate cause element infra.
 D GENUINE ISSUES OF MATERIAL FACT REMAIN REGARDING APPELLANTS' NEGLIGENT DESIGN CLAIM {¶ 75} A common law negligence defective design plaintiff must show that the product "is more dangerous than an ordinary consumer would expect when used in an intended or reasonably foreseeable manner or if the benefits of the challenged design do not outweigh the risk inherent in such design." Knitz v. MinsterMachine Co. (1982), 69 Ohio St.2d 460, 432 N.E.2d 814, syllabus. The standard applied is "one appropriate to the law of negligence: `"* * * [i]t is the duty of a manufacturer to use reasonable care under the circumstances to so design his product as to make it not accident or foolproof, but safe for the use for which it is intended."'" Knitz, 69 Ohio St.2d at 464, quotingTemple v. Wean United, Inc. (1977), 50 Ohio St.2d 317, 326,364 N.E.2d 267, quoting Gossett v. Chrysler Corp. (C.A.6, 1966),359 F.2d 84, 87. In considering the reasonableness of a manufacturer's design choice, courts may look to statutory regulation or industry manufacturing standards. See Vermett,138 Ohio App.3d at 609.
 {¶ 76} In determining whether a product was used in a reasonably foreseeable manner, courts should consider "whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act." Menifee v. Ohio Welding Products, Inc. (1984),15 Ohio St.3d 75, 77, 472 N.E.2d 707. "[A] manufacturer need not anticipate all uses to which its product may be put, nor guarantee that the product is incapable of causing injury in all of its possible uses." Id. at 78. Instead, "only those circumstances which [the manufacturer] perceived, or should have perceived, at the time of [its] respective actions should be considered." Id. at 77.
 {¶ 77} In the case at bar, for the same reasons that genuine issues of material fact remain regarding appellants' statutory products liability claims, we also believe that genuine issues of material fact remain regarding appellants' common law negligent design claim.
 E GENUINE ISSUES OF MATERIAL FACT REMAIN REGARDING PROXIMATE CAUSE {¶ 78} In any product liability case, whether based in common law or statute, a plaintiff must prove that the product defect or the failure to warn about the dangerousness of the product proximately caused his injury. See Freas, 60 Ohio St.3d at 8-9;State Farm, 37 Ohio St.3d at 5-6; R.C. 2307.73(A)(2). "The rule of proximate cause `requires that the injury sustained shall be the natural and probable consequence of the negligence alleged; that is, such consequence as under the surrounding circumstances of the particular case might, and should have been foreseen or anticipated by the wrongdoer as likely to follow his negligent act.'" Jeffers v. Olexo (1989), 43 Ohio St.3d 140, 143,539 N.E.2d 614, quoting Ross v. Nutt (1964), 177 Ohio St. 113,203 N.E. 118. "[I]n order to establish proximate cause, foreseeability must be found. * * * `If an injury is the natural and probable consequence of a negligent act and it is such as should have been foreseen in the light of all the attending circumstances, the injury is then the proximate result of the negligence * * *.'" Mussivand v. David (1989),45 Ohio St.3d 314, 321, 544 N.E.2d 265, quoting Mudrich v. Standard Oil Co.
(1950), 153 Ohio St. 31, 39, 90 N.E.2d 859. "The standard test for establishing causation is the sine qua non or `but for' test. Thus, a defendant's conduct is a cause of the event (or harm) if the event (or harm) would not have occurred but for that conduct; conversely, the defendant's conduct is not the cause of the event (or harm) if the event (or harm) would have occurred regardless of the conduct. Prosser Keeton, Law of Torts (5 Ed. 1984) 266."Anderson v. St. Francis-St. George Hosp., Inc. (1996),77 Ohio St.3d 82, 84-85, 671 N.E.2d 225. "`[L]egal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability.'" Johnson v. Univ. Hosp. of Cleveland
(1989), 44 Ohio St.3d 49, 57, 540 N.E.2d 1370, quoting Prosser 
Keeton, Law of Torts (5 Ed. 1984) 264, Section 41; see, also,Hester v. Dwivedi (2000), 89 Ohio St.3d 575, 733 N.E.2d 1161.
 {¶ 79} Ordinarily, proximate cause is a question of fact for the jury. See Strother v. Hutchinson (1981), 67 Ohio St.2d 282,288, 423 N.E.2d 467, citing Clinger v. Duncan (1957),166 Ohio St. 216, 141 N.E.2d 156. However, "where no facts are alleged justifying any reasonable inference that the acts or failure of the defendant constitute the proximate cause of the injury, there is nothing for the jury [to decide], and, as a matter of law, judgment must be given for the defendant." Case v. MiamiChevrolet Co. (1930), 38 Ohio App. 41, 45-46, 175 N.E.2d 224, quoted in Stibley v. Zimmerman (Aug. 26, 1998), Athens App. No. 97CA51, fn.4, and Kemerer v. Antwerp Bd. of Edn. (1995),105 Ohio App.3d 792, 796, 664 N.E.2d 1380; see, also, Vermett,138 Ohio App.3d at 612 ("While proximate cause is often a jury question, summary judgment is proper on this issue when appellant has failed to meet his burden to produce evidence to challenge unfavorable evidence already in the record.").
 {¶ 80} Any break in the chain of causation will relieve the defendant of liability. See, generally, Leibreich,67 Ohio St.3d at 269 ("[T]he existence of intervening and superseding causes of injury can be a defense to actions brought under theories of both negligence and strict liability in tort."). "A break will occur when there intervenes between an agency creating a hazard and an injury resulting therefrom another conscious and responsible agency which could or should have eliminated the hazard. However, the intervening cause must be disconnected from the negligence of the first person and must be of itself an efficient, independent, and self-producing cause of the injury."Berdyck v. Shinde (1993), 66 Ohio St.3d 573, 584-585,613 N.E.2d 1014 (citations omitted).
 {¶ 81} The test for determining whether an "intervening act was foreseeable, and therefore a consequence of the original negligent act, or whether the intervening act operates to absolve the original actor * * * `is whether the original and successive acts may be joined together as a whole, linking each of the actors as to the liability, or whether there is a new and independent act or cause which intervenes and thereby absolves the original negligent actor.'" Liebreich,67 Ohio St.3d at 269, quoting Cascone v. Herb Kay Co. (1983), 6 Ohio St.3d 155,160, 451 N.E.2d 815. "`The causal connection of the first act of negligence is broken and superseded by the second, only if the intervening negligent act is both new and independent. The term `independent' means the absence of any connection or relationship of cause and effect between the original and subsequent act of negligence. The term `new' means that the second act of negligence could not reasonably have been foreseen.'" R.H. Macy Co., Inc. v. Otis Elevator Co. (1990), 51 Ohio St.3d 108, 111,554 N.E.2d 1313, quoting 1 Ohio Jury Instructions (1983), Section 11.30, quoted in 67 Ohio St.3d at 269-70. Thus, the key determination "`whether an intervening act breaks the causal connection between negligence and injury depends upon whether that intervening cause was reasonably foreseeable by the one who was guilty of the negligence.'" R.H. Macy,51 Ohio St.3d at 110, quoting Mudrich v. Standard Oil Co. (1950),153 Ohio St. 31, 90 N.E.2d 859, quoted in 67 Ohio St.3d at 270. To be an intervening or superseding cause, the act must be unforeseeable in light of all the facts and circumstances. See Queen CityTerminals, Inc. v. Gen. Am. Transp. Corp. (1995),73 Ohio St.3d 609, 619-620, 653 N.E.2d 661; Volter v. C. Schmidt Co., Inc.
(1991), 74 Ohio App.3d 36, 39, 598 N.E.2d 35.
 {¶ 82} Like proximate cause, "the issue of intervening causation generally presents factual issues to be decided by the trier of fact. The determination of intervening causation `involves a weighing of the evidence, and an application of the appropriate law to such facts, a function normally to be carried out by the trier of facts." Liebreich, 67 Ohio St.3d at 269
(citations omitted); Mark v. Mellott Mfg. Co., Inc. (1995),106 Ohio App.3d 571, 5875-88, 666 N.E.2d 631.
 {¶ 83} In the case at bar, we agree with appellants that genuine issues of material fact remain regarding proximate cause and whether Adlridge's or his employer's conduct constituted intervening or superseding causes. First, regarding the employer's alleged negligence, we have previously recognized that a jury may consider an employer's OSHA violations to determine whether "an intervening or superseding cause, rather than a defectively designed product, proximately caused [a plaintiff's] injuries." Mark, 106 Ohio App.3d at 587-88; see, also, Volterv. C. Schmidt Co., Inc. (1991), 74 Ohio App.3d 36, 41,598 N.E.2d 35 (stating that "we are aware of no Ohio precedent establishing, as a rule of law, that an employer's OSHA violation for failure to equip a machine with safety devices relieves a manufacturer of strict liability"). We further stated that "[t]he question of whether [the] employer's failure to follow OSHA regulations proximately caused [the plaintiff's] injuries is a question of fact for the jury to determine." Id. at 593-94. Thus, based on our decision in Mark, we conclude that in the case sub judice a jury must resolve the issue regarding the employer's alleged negligence and whether that alleged negligence constitutes an intervening or superseding cause. Second, regarding Aldridge's alleged negligence, we conclude that whether his conduct in cleaning the conveyor system as his employer instructed constituted an intervening or superseding cause so as to relieve appellee of liability also constitutes a jury question.
 {¶ 84} In Sheets v. Karl W. Schmidt and Assoc., Inc.,
Hamilton App. No. C-20726, 2003-Ohio-3198, the court decided that the plaintiff's negligence, and not a product defect, caused his injuries. In Sheets, the plaintiff worked at Ohio Valley Carton (OVC) and operated a baler that American Baler Company (ABC) manufactured. The plaintiff's job duties included loading cardboard scrap onto a conveyor system, which then fed the scrap into the baler's hopper. Karl W. Schimdt and Associates, Inc. manufactured the conveyor belt. ABC affixed six separate warnings to the baler machine, including one that warned against performing maintenance on the machine without locking out the machine. The baler also included warnings of a "crush area" inside the machine and that there was a risk of "severe injury or death" posed by the moving parts. The plaintiff stated that he had read and understood the warnings.
 {¶ 85} The amount of scrap fed into the baler sometimes caused the machine to jam. One day, a jam occurred. Sheets turned off the machine with the on/off switch and attempted to remove the jam. He did not, however, lock-out the machine because the key had been broken for some time. In attempting to remove the jam, Sheets first opened the side door of the baler, which caused the machine to automatically shut down. When this did not work, he closed the door and climbed onto the machine housing and tried to use a pole to clear the jam through the opening of the hopper. When this did not work, he again opened the side door and tried to fix the jam. When this did not work, he climbed onto the conveyor system. After he reached the top of the conveyor that was next to the baler's hopper, Sheets used a pole to clear the jam. Unfortunately, he lost his balance and fell head first into the baler. As he stood up, the baler activated and crushed his legs. The court concluded that Sheets' "failure to heed the lock-out/tag-out directive * * * ultimately caused his injuries." Id. at ¶ 19.
 {¶ 86} We do not believe that the evidence in the case at bar is similar to Sheets. Here, evidence exists that Aldridge could not have effectively cleaned the machine if he had shut off the conveyors. Furthermore, evidence exists that his employer instructed him to leave the conveyors on while cleaning the accumulated mulch.
 {¶ 87} Consequently, genuine issues of material fact remain regarding proximate cause and whether intervening and superseding causes relieve appellee of liability.
 F GENUINE ISSUES OF MATERIAL FACT REMAIN REGARDING THE AFFIRMATIVE DEFENSES OF UNFORESEEABLE MISUSE AND ASSUMPTION OF THE RISK {¶ 88} Appellants next assert that the trial court erred by determining that the affirmative defenses of unforeseeable misuse and assumption of the risk barred their claims. Appellants assert that neither defense applies in the case at bar. They claim that the unforeseeable misuse defense applies "in cases of extreme, ridiculous misuse." Appellants contend that the assumption of the risk defense does not apply because Aldridge was unaware an injury could occur from cleaning the machine as his employer instructed. They further argue that the defense is not available when an employee is injured while encountering a risk during the performance of his required job duties.
 {¶ 89} Appellee claims that the trial court properly determined that Aldridge's attempt to clean the conveyor with the belts running when a shut off button was available that would have allowed him to clean off the mulch and debris without risking injury constituted an unforeseeable misuse of the machinery. Appellee disputes appellants' claim that assumption of the risk defense does not apply in the case sub judice and further asserts that the defense bars his claim.
 1. UNFORESEEABLE MISUSE {¶ 90} A trial court may grant summary judgment in a manufacturer's favor when the plaintiff uses the product "in a capacity which is clearly unforeseeable by the manufacturer and completely incompatible with the product's design." Welch,107 Ohio App.3d at 225; see, also, Cox v. Oliver Machinery Co.
(1987), 41 Ohio App.3d 28, 31, 534 N.E.2d 855. "`Misuse' of a product suggests a use which was unanticipated or unexpected by the product manufacturer, or unforeseeable and unanticipated."Markus v. SICO, Inc. (May 13, 1999), Cuyahoga App. No. 74060.
 {¶ 91} In the case at bar, genuine issues of material fact remain regarding whether Aldridge's use of the product was unforeseeable and completely incompatible with the conveyor's design. Appellants presented evidence to show that the conveyors could not be cleaned effectively if the conveyor belts were not running.
 {¶ 92} Consequently, we believe that genuine issues of material fact remain regarding the unforeseeable misuse defense.
 2. ASSUMPTION OF THE RISK {¶ 93} Assumption of the risk may be asserted as a defense to a products liability claim. See Carrel v. Allied Products Corp.
(1997), 78 Ohio St.3d 284, 677 N.E.2d 795, paragraph two of the syllabus; Syler v. Signode Corp. (1992), 76 Ohio App.3d 250,253, 601 N.E.2d 225. "For the defense of assumption of the risk to act as a bar to recovery of damages, the defendant must establish that the plaintiff knew of the condition, that the condition was patently dangerous, and that the plaintiff voluntarily exposed himself or herself to the condition. Ordinarily, assumption of the risk is a question of fact to be resolved by the factfinder." Carrel, 78 Ohio St.3d at 289
(citations omitted). "To bar recovery, the plaintiff must voluntarily and unreasonably assume a known risk." Syler,76 Ohio App.3d at 253 (citations omitted). "An employee will be deemed to have voluntarily exposed himself or herself to a risk when he or she has elected to use a defective product." Carrel,
paragraph two of the syllabus; Evanoff, 99 Ohio App.3d at 343. However, the assumption of the risk defense "is not available when the employee is required to encounter the risk while performing normal job duties." Carrel, paragraph two of the syllabus. The defense is not available "in those situations where the job duties require the employee to encounter the risk, and the employee is injured while engaging in normal job-related tasks." Carrel, 78 Ohio St.3d at 290. "An employee does not voluntarily or unreasonably assume the risk of injury which occurs in the course of his or her employment when that risk must be encountered in the normal performance of his or her required job duties and responsibilities." Cremeans v. Willmar HendersonMfg. Co. (1991), 57 Ohio St.3d 145, 566 N.E.2d 1203, syllabus. In Cremeans, "[a]lthough the four justices who concurred in the syllabus could not agree on the extent to which the defense of assumption of risk should apply in this type of case, they clearly agreed that the defense could not be asserted by the manufacturer when the employee is specifically required by his employer to use the product in question." Evanoff v. Grove Mfg.Co. (1994), 99 Ohio App.3d 339, 342, 650 N.E.2d 914.
 {¶ 94} In Knopp v. Dayton Machine Tool Co., Columbiana App. No. 03CO60, 2004-Ohio-6817, the court determined that the plaintiff voluntarily assumed the risk of injury after he cleaned an area of machinery his employer had not instructed him to clean. In Knopp, the employer trained the plaintiff to clear debris only from the right-hand side of the machine by using an air hose on the area after each pass. After his employer told him to "sweep up," he noticed that there was debris in the left-hand side of the machine, where the cutters were located. He had not noticed debris in this area at the beginning of his shift, but was unaware that the machine was built to automatically clean out this area. He decided to clean this area out with the air hose. While the machine was running and the cutters were spinning, the plaintiff held the air hose over the guard of the machine with his right hand and tried to blow it out, but was unsuccessful. He then switched the air hose to his left hand and tried reaching for the debris with his right hand while holding the air hose in the machine with his left. While he was doing so, his shirt became caught in the cutters and his right arm was pulled into them.
 {¶ 95} In concluding that the plaintiff assumed the risk of injury, the court explained:
"Knopp admits that he was not told to clean that area of the machine. Indeed, it was unnecessary for him to clean that part of the machine since it was self-cleaning. Instead, Knopp argues that he believed he was required to do so when Griffin told him to `sweep up' at the end of his first shift at Vari-Wall Tube. Knopp noticed that the area in question was clean at the beginning of his shift and assumed that it should be clean at the end of his shift.
But Griffin's request that Knopp `sweep up' after his shift was not an order that Knopp clean that particular part of the machine while the machine was running. Even Knopp admits that he understood the term `sweep up' to mean clean the area with a broom and that he did not use a broom when he was reaching over the guard. According to Knopp, he decided to look into and clean that part of the machine on his own initiative. Knopp would have to disregard everything he learned in training and the common sense understanding he had of the danger to believe that Griffin was compelling him to assume the danger by cleaning that area of the machine.
During his training, Knopp was instructed not to touch any moving parts and not to stick his hands in the machines. He was also advised that he should not wear long-sleeved shirt[s], although this was not a requirement. Knopp disregarded this advice * * *. Griffin showed Knopp where the guards were and where not to put his hands. Knopp understood that placing his hands in those places could injure him since the cutters were dangerous. A warning to `Keep Your Hands Clear' was on the guard that Knopp reached over when trying to clean that area of the machine.
Knopp was under no compulsion to expose himself to the risk of cleaning that area of the machine while it was running. No one ordered him to clean that area of the machine while it was running. Nor was cleaning that area of the machine a normal part of his job. That conduct was contrary to his training and his common sense knowledge about the risk involved. It was contrary to the warnings he received from Griffin and the strongly worded written warning on the guard itself."
The Knopp court further relied upon Westover v. WhiteStorage and Retrieval Systems, Inc. (Nov. 1, 2000), Summit App. No. 19845, to reach its decision, noting:
"In Westover, the plaintiff was a maintenance employee who was injured when his right arm was pulled into the rollers of a conveyor system. Before the accident, a supervisor had asked the plaintiff to `do something' about the noise coming from the conveyor. The plaintiff then removed a guard covering a pinch point in the system while the system was running and was injured. The plaintiff testified that he knew he should turn off the machine every time he worked on the conveyor and that the guard was there to prevent him from being injured. He argued that he did not because he felt the supervisor's order to `do something' about the noise compelled him to encounter the risk of being caught in the conveyor while it was running. After a trial, the trial court directed a verdict in the defendant's favor. The appellate court affirmed the trial court's decision.
`[E]ven if [the supervisor] did, as he said, ask [the plaintiff] to "do something" about the noise, this statement is a far cry from instructing him to engage in such risky behavior as removing a guard while the conveyor was running. Even viewing this statement in a light most favorable to [the plaintiff], it cannot be construed as compulsion to assume the risk of being caught in the rollers of a conveyor system. * * *
[The plaintiff's] job did not require him to remove the guard while the machine was running. [The plaintiff's] own expert witness * * * testified that [the plaintiff] could have turned of[f] the machine before removing the guard. He could than have turned the conveyor back on in order to observe it from a safe distance. * * * [T]his simple precaution would have avoided [the plaintiff's] entrapment by the rollers while he was engaged in removing the guard. * * *
[The plaintiff] was under no compulsion to expose himself to the risk. No one ordered him to remove the guard while the belt was running. Nor was removal of the guard while the conveyor was running a normal part of his job. In fact, that conduct was contrary to everything he had been taught about working on conveyor systems. It was contrary to all the warnings he had received from [his supervisor], as well as the strongly worded warning on the guard itself. [The plaintiff] elected to expose himself to the risk of injury here.'"
The case sub judice is not similar to either Knopp orWestover. In both Knopp and Westover, the employer gave the injured employee vague instructions to "sweep up" or "do something" about a noise. In Knopp, the employer did not train the employee to clean the machine in the manner that ultimately led to his injury. In Westover, removing the guard "was contrary to all the warnings" his employer gave the plaintiff. In the case at bar, by contrast, disputed factual issues remain regarding whether Aldridge's employer had instructed him to clean the conveyor belts in the exact manner that ultimately caused his injury. Aldridge presented evidence to show that his normal job duties required him to encounter the risk. While appellee presented contrary evidence, these disputed facts must be resolved before one can determine whether the defense bars his claim. Thus, if Aldridge followed his employer's example and instruction when his injury occurred, then the assumption of the risk defense may not apply in the case at bar.
 {¶ 96} Consequently, genuine issues of material fact remain regarding the assumption of the risk defense.
 III CONCLUSION {¶ 97} At this juncture, appellants presented evidence to demonstrate that genuine issues of material fact remain regarding their statutory product liability claims (defective design and failure to warn) and their common law negligent defective design and failure to warn claims. Thus, the trial court erred by entering summary judgment in appellee's favor. We note, however, that this decision is not meant to express our opinion on the merits of appellants' claims. A jury may well determine that appellee is not liable under any of the theories. Additionally, on remand the parties may submit additional evidence that could resolve hereafter disputed issues of material fact. At this stage of the proceedings, however, disputed facts remain that prevent summary judgment in appellee's favor.
 {¶ 98} Accordingly, based upon the foregoing reasons, we sustain appellants' assignment of error, reverse the trial court's judgment and remand the matter for further proceedings consistent with this opinion.
Judgment reversed and remanded for further proceedings consistent with this opinion.
 JUDGMENT ENTRY
It is ordered that the judgment be reversed and remanded for further proceedings consistent with this opinion. Appellants shall recover of appellee the costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Gallia County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Harsha, P.J.: Concurs in Judgment Only Kline, J. Abele, J.: Concur in Judgment Opinion
[1] Appellants eventually settled their claims against Aldridge's employer.
[2] Effective April 7, 2005, the Ohio General Assembly amended several of the product liability statutes that we discuss in this opinion and stated its intent to supersede Carrel. See S.B. 80, Section 3(D). Because appellants' cause of action arose before the amendments, however, we apply the former versions of the statutes.
[3] Some courts have treated the substantial alteration issue as a defense under proximate cause, concluding that it is basically an argument that the substantial alteration was an intervening and superseding cause. See Davis v. Cincinnati,Inc. (1991), 81 Ohio App.3d 116, 120, 610 N.E.2d 496 ("Courts have held that a manufacturer or seller is not liable for injuries caused by alteration which amounts to an intervening or superseding cause. In Ohio, a defendant manufacturer or seller must show that there has been a substantial change in the product after it left his hands and that such change amounted to an intervening or superseding cause."); Cox, 41 Ohio App.3d at 33
(stating that "to a certain extent, a substantial alteration or modification of the product will act as an intervening and superseding cause").
For example, in Temple the Ohio Supreme Court concluded that the employer's alteration of the product "was the sole responsible cause" of the plaintiff's injuries. In Temple, the plaintiff suffered injuries while operating a 75-ton power punch press. When the plaintiff's employer acquired the machine, it modified the operating control circuits, replaced the original rotary switch, and installed new operating buttons. The employer altered the existing method of guarding by lowering the power press activating buttons from their original position. The Ohio Supreme Court concluded that "[c]learly, in relation to the danger of unintentional activation, this alteration was a `substantial change' * * *. Indeed, it is our conclusion that there was no original defect of any sort in the punch press, and that, as a matter of law, [the employer's] alteration of the safety device, coupled with the utilization of the press for the stamping of stock long enough to bridge the 24 inch gap between the buttons, was the sole responsible cause of [the plaintiff's injury]." 50 Ohio St.2d at 323.
Although some cases treat the substantial alteration issue under the causation element, we find it more appropriate to address it under the second element of a strict products liability claim: whether the defect existed at the time the product left the manufacturer's control.